IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EMILY SUZANNE AZBELL,

                    *Plaintiff,*

        v.                                                    CIVIL ACTION
                                                              NO. 19-01658
ANDREW SAUL,
Commissioner of Social Security
                    *Defendant.*

**PAPPERT, J.**                                               **April 24, 2020**

### MEMORANDUM

Emily Suzanne Azbell applied for Supplemental Security Income under the Social Security Act. She alleged that she had become disabled as of September of 2015 and sought disability benefits from that date on. The Commissioner of Social Security rendered a partially favorable decision, awarding Azbell benefits starting from June 14, 2016, but denying her benefits for the nine or so months before that date. After reviewing the administrative record, United States Magistrate Judge Jacob P. Hart recommended that the Court deny Azbell's Requst for Review and enter judgment in the Commissioner's favor. Azbell objects to Judge Hart's Report & Recommendation. The Court overrules Azbell's Objections and adopts the Report & Recommendation.

### I

Azbell is a forty-year-old woman with a high-school education. *See* (R., Vol. VI, at 221, ECF No. 10-6). In the early 2000s, she worked full-time as a patient registrar at several medical facilities. *See* (*id.*, Vol. VII, at 245, ECF No. 10-7). Then from August of

2013 to September of 2014, she worked part-time as a babysitter.[1]  *See* (*id.*)  Since then Azbell has not worked, aside from a one-month effort to reenter the workforce in 2017. *See* (*id.*, Vol. VII, at 291).

A

In August of 2015, Azbell applied for Supplemental Security Income.  *See* (*id.*, Vol. VI, at 221–29).  She alleged that health problems—specifically, mental health issues and gastroesophageal reflux disease—forced her to stop working and rendered her disabled as of September of 2014.  (*Id.*, Vol. VII, at 244.)  But applicants are ineligible for disability benefits until the month after applying for benefits.  *See* 20 C.F.R. § 416.202(g); *id.* § 416.203(b).  So for benefits purposes, the earliest date that Azbell could claim to be disabled—known as the "onset date"—was September of 2015.

The Social Security Administration initially denied Azbell's application without a hearing.  *See* (R., Vol. IV, at 109–13, ECF No. 10-4).  It did so based on the conclusions of two agency reviewers.  *See* (*id.*, Vol. III, at 98–108, ECF No. 10-3).  The first reviewer noted Azbell's history of gastroesophageal reflux and edema (that is, swelling) of her lower legs and ankles.  *See* (*id.* at 100–01).  But these ailments, this reviewer concluded, constituted only "minimal physical impairments."  (*Id.* at 100.)  The second reviewer, Dr. Sandra Banks (a mental health expert), similarly concluded that Azbell's alleged mental impairments did not preclude her from performing certain jobs.  *See* (*id.* at 101–05).  Relying on these conclusions, the Social Security Administration determined that Azbell was not disabled.  *See* (*id.*, Vol. IV, at 109–13).

---

[1]     At times, Azbell disputes that she worked at all from 2013 to 2015.  *See, e.g.*, (R., Vol. VII, at 290–91).  The record, however, shows otherwise.  Indeed, Azbell herself told the Social Security Office interviewer that she stopped working in September of 2014, which coincides with her self-reported work as a babysitter.  *See* (*id.* at 244–45); *see also* (*id.*, Vol. VI, at 230–38).

Azbell requested a hearing with an administrative law judge on her application. *See* (*id.* at 114-16). In her pre-hearing brief, Azbell described her many ailments, including "severe swelling of her legs," morbid obesity, "PTSD, anxiety, depression, and OCD." (*Id.*, Vol. VII, at 291–92). The swelling, she explained, first became debilitating in August of 2015 when she was twice hospitalized with complaints of severe swelling in her legs. *See* (*id.* at 291, 295). From that point on, Azbell claimed, her leg edema was "intractable to improvement" and required her to "keep her legs raised above waist level while seated." (*Id.* at 292.) And she pointed out that her history of "depression, anxiety and OCD" had been well-documented long before the alleged September 2015 onset date. *See* (*id.* at 294).

Along with her pre-hearing brief and medical records, Azbell submitted interrogatory responses from three of her treating physicians—Drs. Marshall Miller, Geoffrey Ouma and Ronald Serota. *See* (*id.*, Vol. XXXIX, at 2470–74, ECF No. 10-39); (*id.*, Vol. XL, at 2475–77, ECF No. 10-40); (*id.* at 2478–92). All three interrogatories posed leading questions that elicited short responses, often one or two words and at most a few sentences. For example, the form asked Dr. Miller, Azbell's general practitioner, to state the cause of "the severe swelling of [Azbell's] lower extremities" "[f]or all periods August/September 2015." (*Id.*, Vol. XXXIX, at 2472.) In response, Dr. Miller attributed the edema to "chronic venous insufficiency complicated by and exacerbated by obesity and hypothyroidism." (*Id.*) But he never specified when that condition arose, whether it had worsened over time or how it affected Azbell. *See* (*id.* at 2472–74). Dr. Miller did say that Azbell's edema reached severe levels more than half the time and limited her to four hours of standing and six hours of sitting (with breaks

3

to elevate legs).  *See* (*id.* at 2473).  After recognizing Azbell's other physical ailments,
Dr. Miller opined without explanation that the combination of ailments—rather than
the edema alone—would force Azbell to miss five to six work days a month and be "off
task" an hour or two each day.  (*Id.* at 2474.)

Dr. Ouma's interrogatory responses were even more perfunctory.  He responded
that he first treated Azbell a few months earlier in October of 2017 for her leg edema.
*See* (*id.*, Vol. XL, at 2477).  Though Dr. Ouma, an expert in vascular medicine, opined
that Azbell's edema required her to keep her legs raised above waist level, he left that
suggestion out when listing his recommended treatments.  *See* (*id.*)  Overall, he rated
Azbell's chances for improvement as "Good."  (*Id.*)

In his responses, Dr. Serota, Azbell's psychiatrist, noted that he had treated
Azbell for depression, opiate-use disorder, anxiety and nicotine-use disorder. (*Id.* at
2480.)  In the narrative section, the interrogatories asked whether Azbell had
impairments in certain abilities and, if so, whether those impairments were "marked or
extreme."  (*Id.* at 2481.)  For some functions, Dr. Serota left the response blank,
indicating no impairment.  *See, e.g.*, (*id.* at 2482).  For others, he represented that
Azbell had an impairment but did not describe that impairment as "marked" or
"extreme."  *See, e.g.*, (*id.*)  Dr. Serota rated two impairments as "marked" and two
others as "severe."  (*Id.* at 2481–82.)  He described other abilities as "fair" or "poor"
without indicating if that rating translated to an impairment by medical standards.
(*Id.* at 2481.)  In the check-the-box section of the interrogatories, Dr. Serota indicated
that Azbell had at least a "moderate limitation" in every ability.  *See* (*id.* at 2488–91).
And for some functions that he had earlier characterized simply as "impaired," he now

checked the "marked limitation" box.  *Compare* (*id.* at 2482), *with* (*id.* at 2490).  In fact, Dr. Serota checked boxes indicating that Azbell had "a substantial loss" of abilities for which he had noted no impairment a few pages earlier.  *Compare* (*id.* at 2482), *with* (*id.* at 2492).  Despite these inconsistencies, Dr. Serota responded that Azbell's limitations had "existed *at the assessed severity*" since September of 2013.  (*Id.*)

B

After reviewing the record, the ALJ held a hearing.  *See* (*id.*, Vol. II, at 39–97, ECF No. 10-2).  At the hearing, Azbell testified that she was "very depressed," unable to concentrate and anxious.  (*Id.* at 62.)  She added that her legs had been "extremely swollen" "[e]very day" since August of 2015.  (*Id.* at 68.)  This swelling, Azbell explained, required her to elevate her feet above her heart and prevented her from working.  *See* (*id.* at 68–69).  A vocational expert testified that some unskilled jobs existed for an individual of Azbell's age, education and work history who could sit for six hours, stand for two hours and perform simple, routine tasks.  (*Id.* at 80–81.)  The same jobs were available to someone with the described limitations who also would "be off task 10 percent in addition to normal breaks."  (*Id.* at 82.)  But if that same person was off task fifteen percent or required four twenty-minute breaks each day, no jobs would be available, the expert clarified.  (*Id.* at 82–83.)

The ALJ issued a partially favorable decision.  *See* (*id.* at 14–26).  He found that since September of 2015,[2] the alleged onset date, Azbell had suffered from several severe impairments, including lower extremity edema, depression, anxiety and obsessive-compulsive disorder.  (*Id.* at 16.)  But those impairments, the ALJ concluded,

---

[2]     Throughout his decision, the ALJ mistakenly listed the alleged onset date as September 1, 2014.  *See* (R., Vol. II, at 16); (Objs. to R. & R. 3 n.3, ECF No. 19).

5

were not so severe as to meet the requirements of a "listed impairment" under federal regulations, which if satisfied would have automatically entitled Azbell to disability benefits.  *See* (*id.* at 17).  The ALJ then determined that from the alleged onset date to June 14, 2016, Azbell had the "residual functional capacity"—a measure of what an applicant can do in a work setting given her physical and mental limitations—to perform some light work.  (*Id.* at 20–24.)  With that capacity, Azbell could have performed several jobs in the national economy, meaning she was not disabled.  *See* (*id.* at 28–29).  The ALJ found that, for the period after June 14, 2016, Azbell had the same residual functional capacity, but because her worsening edema now required her to elevate her legs above waist level, she would also be "off task fifteen percent in addition to normal breaks."  (*Id.* at 25–26.)  This added limitation disqualified Azbell from all jobs in the economy.  *See* (*id.* at 28).  Thus, the ALJ found that Azbell was disabled as of June 14, 2016.  (*Id.* at 29.)

Once the Social Security Appeals Council denied Azbell's requested appeal, the ALJ's decision became the Commissioner's final decision.  *See* (*id.*, Vol. II, at 1–3); 20 C.F.R. § 416.1400(1)(5).  Azbell then timely filed for judicial review of the Commissioner's decision.  *See* (Compl., ECF No. 2); (Request for Review, ECF No. 14); 42 U.S.C. § 405(g).  After reviewing the record, Magistrate Judge Hart recommended denying Azbell's request for review and entering judgment for the Commissioner.  (R. & R. 1, ECF No. 18.)  Azbell now objects to Judge Hart's Report & Recommendation, arguing that Judge Hart overlooked three of the ALJ's errors.  (Objs. to R. & R., ECF No. 19.)

II

A district court "may accept reject, or modify, in whole or in part, the findings

6

and recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). It reviews *de novo* portions of a magistrate's recommendation to which a party timely objects. *Id.* By failing to object to a legal conclusion or factual finding, a party loses her right to *de novo* review. *See Orie v. Dist. Attorney Allegheny Cty.*, 946 F.3d 187, 193 (3d Cir. 2019). That said, even absent objections, courts should give "reasoned consideration" short of *de novo* review to dispositive legal issues. *EEOC v. City of Long Beach*, 866 F.3d 93, 100 (3d Cir. 2017). Or a court may, if it wishes, independently review *de novo* "the entire record and applicable law" despite the lack of objections.3 *Orie*, 946 F.3d at 193.

The Commissioner's decision and findings are conclusive "if supported by substantial evidence." 42 U.S.C. § 405(g). This threshold "is not high." *Biestek v. Berryhill*, 587 U.S. ----, 139 S. Ct. 1148, 1154 (2019). It requires only "such relevant evidence as reasonable minds might accept as adequate to a support a conclusion." *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "[M]ore than a mere scintilla" of evidence will suffice. *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229). In reviewing for substantial evidence, a court may not reweigh the evidence or substitute its conclusions for the Commissioner's. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011).

### III

### A

In her first objection, Azbell claims that the ALJ erred in determining her residual functional capacity from September of 2015 to June 14, 2016. *See* (Objs. to R. & R. 4–9). Specifically, she says that her medical records and Dr. Miller's and Dr.

---

3    In resolving Azbell's Objections, the Court reviewed *de novo* the entire record and applicable law; it gave "reasoned consideration" to unpreserved issues.

Ouma's interrogatory responses proved that, even before September of 2015, her edema forced her to elevate her legs "at least four times a day for twenty minutes each," which put her "off task" more than fifteen percent of the workday.  (*Id.* at 9.)  Under federal regulations, Azbell points out, the ALJ had to give her treating doctors' opinions "controlling weight" if well-supported and consistent with the other evidence in the record.  20 C.F.R. § 416.927(a)(c); *see* (Objs. to R. & R. 5–9).  And in her view, no record evidence entitled the ALJ to discard her treating physicians' opinions and find that she "would not have been off task more than fifteen percent" from September of 2015 to June 14, 2016.  (*Id.*)

Substantial evidence supports the ALJ's conclusion.  Medical records show that Azbell's edema fluctuated in severity over 2015 and 2016.  In early 2015, for example, she had "mild bilateral ankle edema."  (R., Vol. IX, at 386, ECF No. 10-9.)  A few months later, an examination of her legs revealed no swelling.  *See* (*id.* at 458).  Then in August of 2015, Azbell was twice hospitalized to treat her edema.  *See* (*id.*, Vol. X, at 490–99, 542–51, ECF No. 10-10).  But as Azbell herself remarked at the time, the "swelling [was] intermittent."  (*Id.* at 567.)  Just a few weeks later, an ultrasound of her legs came back normal.  *See* (*id.*, Vol. XII, at 676–77, ECF No. 10-11).  By October Azbell "report[ed] that her swelling [was] much improved," an assessment her doctor seconded.  (*Id.* at 681); *see* (*id.* at 684, 689).   In April of 2016, however, the edema worsened.  (*Id.*, Vol. XXV, at 1619, ECF No. 10-25.)  And this downward trend continued into June and beyond.  *See* (*id.*, at 1619–30); (*id.*, Vol. XXIV, at 1512, ECF No. 10-24).

Treatment records also reveal that Azbell's doctors did not instruct her to consistently elevate her legs until June of 2016.  In August of 2015, doctors discharged

Azbell from the hospital with instructions to elevate her legs and avoid prolonged standing for the next two weeks. *See* (*id.*, Vol. XXII, at 1406, ECF No. 10-22). But that temporary limitation quickly dissipated as Azbell reported that she had been doing "a lot of walking" just a few weeks later. (*Id.*, Vol. XII, at 686.) Azbell continued "walk[ing] a lot" through late April of 2016. (*Id.*, Vol. XXV, at 1619.) During this period, doctors prescribed medication to treat the edema but recommended no other treatment. *See* (*id.* at 1619–21). Only on June 14, 2016, did doctors instruct her to "elevate her feet" as part of her regular treatment. (*Id.*, Vol. XIII, at 804, ECF No. 10-13.) From then on, references to the need for Azbell to elevate her feet litter the medical records. *See, e.g.*, (*id.*, Vol. XX, at 1266–67, 1301–-2). In short, the record supports the ALJ's pinpointing June 14, 2016, as the date that Azbell's edema required her to regularly elevate her feet, which, in turn, put her off task fifteen percent of the workday.

Dr. Miller's interrogatory responses did not oblige the ALJ to reach a contrary conclusion. Dr. Miller responded that, "to help reduce swelling," Azbell had to elevate her legs "at least four times a day for twenty minutes each." (*Id.*, Vol. XXXIX, at 2473.) But as the ALJ observed, Dr. Miller provided neither "a function-by-function analysis" nor "supporting evidence for [his] findings." (*Id.*, Vol. II, at 26.) In any event, it is unclear that Dr. Miller's responses addressed Azbell's then-existing condition or her condition in 2015 and 2016. Although the interrogatories at one point asked Dr. Miller to address Azbell's condition "[f]or all periods August/September 2015 to present," (*id.*, Vol. XXXIX, at 2472), the relevant questions used the present tense, suggesting they concerned Azbell's present condition, *see* (*id.* at 2472–74). The key question, for instance, asked: "When seated does [Azbell] need to keep her legs raised to help reduce

swelling?"  (*Id.* at 2473.)  Dr. Miller's answered:  "Yes—or elevated for a minimum 20

minutes 4x/day."  From that question and response, it is hardly obvious that Dr. Miller

in fact believed that Azbell had to elevate her legs before June of 2016.  Given this

uncertainty and the contrary medical evidence, the ALJ properly declined to afford Dr.

Miller's interrogatory responses controlling weight.  *See* 20 C.F.R. § 416.927(c); *cf. Jones*

*v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991).

Dr. Ouma's responses are of even less help to Azbell's objection.  He first treated

Azbell in October of 2017, so he could not opine as a treating physician on Azbell's

condition in 2015 and 2016.  *See* (R., Vol. XL, at 2477).  Nor did Dr. Ouma speculate

from the medical records as to the severity of Azbell's edema pre-2017.  *See* (*id.*)

Rather, he stated merely that—as of late 2017—Azbell's swelling required her to

elevate her legs above waist level.  (*Id.*)  And contrary to Dr. Miller's pessimistic

prognosis, Dr. Ouma—a vascular specialist—rated Azbell's chances for improvement as

"Good."  (*Id.*)  These responses cast no doubt on the ALJ's finding that Azbell's edema

became debilitating in June of 2016 but not earlier.

## B

Azbell's second objection accuses the ALJ of wrongly rejecting the alleged onset

date for her leg edema.  *See* (Objs. to R. & R. 9–11).  Under Social Security Ruling 83-

20, she states, the ALJ had to use her proposed onset date unless that date was

inconsistent with the evidence.  (*Id.* at 10.)  By rejecting the alleged onset date without

evidence supporting the ALJ's chosen onset date— June 14, 2016—the ALJ erred,

Azbell reasons.  *See* (*id.* at 10–11).  He then further erred by not calling a medical

advisor for medical guidance in determining the onset date, as Ruling 83-20

commanded.  (*Id.*)

The ALJ did not err.  As explained above, the medical records offer substantial support for the ALJ's finding that Azbell's edema became debilitating in June of 2016. Given this evidence, Ruling 83-20 did not bind the ALJ to adopt Azbell's alleged onset date.  Nor did that Ruling force the ALJ to seek help from a medical advisor to determine the onset date.  The Third Circuit has held that an ALJ must call on a medical advisor only if "the alleged impairment was a slowly progressing one, the alleged onset date was far in the past, and adequate medical records for the most relevant period were not available."  *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 549 n.7 (3d Cir. 2003) (discussing *Walton v. Halter*, 243 F.3d 703, 709 (3d Cir. 2001)).  But the record here overflows with medical records.  *See* (R., Vols. IX–XL, at 386–2492). With this ample medical evidence, the ALJ had no duty to "seek out a medical expert." *Kushner v. Comm'r of Soc. Sec.*, 765 F. App'x 825, 830 (3d Cir. 2019) (unpublished); *see also Chandler*, 667 F.3d at 361–62; *Jakubowski v. Comm'r of Soc. Sec.*, 215 F. App'x 104, 108 (3d Cir. 2007) (unpublished).

## C

Finally, Azbell challenges the ALJ's rejection of Dr. Serota's opinion on her mental impairments.  *See* (Objs. to R. & R. 11–18).  In his interrogatory responses, Dr. Serota checked boxes indicating that Azbell's mental impairments met the requirements of Listings 12.04 (depressive disorder) and 12.06 (anxiety and obsessive-compulsive disorders).  *See* (*id.*, Vol. XL, at 2485–86, 2488–92).  The ALJ, however, found that Azbell had no more than moderate limitations, which fell short of the Listings' requirements.  *See* (*id.*, Vol. II, at 23–24).  To reach that conclusion, Azbell argues, the ALJ must have impermissibly relied on either his lay interpretation of the medical evidence or the opinion of Dr. Banks, who never examined Azbell.  Either way,

11

she says, the ALJ erred.  *See* (Objs. to R. & R. 13–18).

An ALJ must give a treating physician's opinion "controlling weight" if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  20 C.F.R. § 419.927(c)(2).  Treating physicians' opinions also ordinarily trump contrary opinions of non-examining physicians.  *Id.*; *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).  That said, when a treating physician's opinion "conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'"  *Id.* (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)).  And in the end, it is the ALJ—not the treating physician—who "must make the ultimate disability and [residual functional capacity] determination."  *Chandler*, 667 F.3d at 361 (citing 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c)).

The ALJ properly afforded Dr. Serota's opinion little, rather than controlling, weight.  *See* (R., Vol. II, at 26).  Dr. Serota contradicted himself throughout his cursory, barely legible responses.  On one page, for example, he wrote that Azbell's ability to interact with others was merely "[i]mpaired."  (*Id.*, Vol. XL, at 2482.)  A few pages later, however, he checked the box indicating that Azbell had a marked limitation in that ability.  (*Id.* at 2490.)  On the next page, Dr. Serota checked the box saying that Azbell had "a substantial loss of ability to understand, remember and carry out simple instructions."  (*Id.* at 2491.)  But he had earlier failed to identify any impairment in Azbell's "ability to understand, remember and apply information."  (*Id.* at 2482.)  Similar contradictions permeate Dr. Serota's responses, rendering his opinion unreliable.  *See* (*id.* at 2481–92); *cf. Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir.

1993) (remarking that form reports without thorough written responses have "suspect" reliability); *Jones*, 954 F.2d at 129 (approving of the ALJ's giving little weight to treating physician's "internally contradictory" opinion).

Contradictions aside, the extreme limitations Dr. Serota (sometimes) noted also conflicted with the other evidence.  Record after record—many written by Dr. Serota himself—rated Azbell's insight and judgment as "good"; described her thought process as "linear"; noted her "good eye contact" and "cooperative" attitude"; and recorded no psychiatric abnormalities.  *See, e.g.*, (R., Vol. X, at 535, 570–71); (*id.*, Vol. XII, at 684, 689, 694, 710, 718); (*id.*, Vol. XXXVIII, at 2341, 2345, 2348, 2351, 2360, 2364, 2395).  Dr. Serota's dire assessment of Azbell's limitations, which he said began in September of 2013, also clashed with her ability to successfully navigate public housing, work as a babysitter five days a week in 2013 and 2014, care for her young daughter, get to and from appointments and follow medical instructions.  *See* (*id.*, Vol. II, at 64–65, 69); (*id.*, Vol. VII, at 245).  Given this substantial contrary evidence, Dr. Serota's interrogatory responses did not bind the ALJ.  *Cf. Sutherland v. Comm'r of Soc. Sec.*, 785 F. App'x 921, 928 (3d Cir. 2019) (unpublished) (explaining that ALJ rightly discounted treating physician's opinion because it was inconsistent with other evidence); *Salerno v. Comm'r of Soc. Sec.*, 152 F. App'x 208, 209–210 (3d Cir. 2005) (unpublished) (same).

Unlike Dr. Serota's, Dr. Banks's opinion fit the record evidence.  According to Dr. Banks, Azbell had moderate limitations in some areas and no limitations in others.  *See* (R., Vol. III, at 103–05).  This assessment found support in Dr. Serota's and other doctors' treatment notes.  *See, e.g.*, (*id.*, Vol. X, at 535, 570–71); (*id.*, Vol. XII, at 684, 689, 694, 710, 718); (*id.*, Vol. XXXVIII, at 2341, 2345, 2348).  Although Dr. Banks never

examined Azbell, her opinion still merited "significant consideration." *Chandler*, 667

F.3d at 361.  By giving Dr. Banks's opinion "partial weight," the ALJ appropriately

considered her opinion while noting its limitations.  (R., Vol. II, at 24.)  And with Dr.

Banks's opinion and the thousands of pages of treatment notes from Azbell's various

doctors to rely on, the ALJ's decision did not improperly rest on lay interpretation of

medical evidence.  *See Chandler*, 667 F.3d at 362; *Titterington v. Barnhart*, 174 F. App'x

6, 11 (3d Cir. 2006) (unpublished).

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.